IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 1. IN THE MATTER OF THE SEARCH OF A RESIDENCE LOCATED AT 3047 NORTH LAWERENCE STREET, PHILADELPHIA, PENNSYLVANIA, 19133. | |
| 2. IN THE MATTER OF THE SEARCH OF A CELLULAR OR ELECTRONIC DEVICE THAT FUNCTIONS WITH PHONE NUMBER 215-869-4652 AND ANY OTHER MOBILE DEVICE BELONGING TO JOSE GUZMAN | Case No. 24-MJ-1490<br><br>**Filed Under Seal** |
| 3. IN THE MATTER OF THE SEARCH OF THE PERSON OF JOSE GUZMAN | |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Zachary Jordan, being first duly sworn, depose and state under oath as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a warrant to search a residence located at **3047 North Lawrence Street, Philadelphia, Pennsylvania, 19133 ("SUBJECT PROPERTY")** which is further described in the following paragraphs and Attachment A-1, to seize the property described in the following paragraphs and Attachment B-1.

2.      I also make this affidavit in support of an application for a warrant to search the cellular phone or electronic device that functions with phone number **(215)-869-4652 AND ANY OTHER MOBILE DEVICE BELONGING TO JOSE GUZMAN (DOB: 10/12/1974)**

("**SUBJECT PHONES**"), which are further described in the following paragraphs and Attachment A-2, to seize the property described in the following paragraphs and Attachment B-2.

3.     I also make this affidavit in support of an application for a warrant to search the person of **JOSE GUZMAN (DOB: 10/12/1974) ("SUBJECT PERSON")** for the purposes of locating **SUBJECT PHONES,** known or otherwise, as described in the following paragraphs and Attachment A-3, to seize the property described in the following paragraphs and Attachment B-3.

4.     The **SUBJECT PHONES** and **SUBJECT PERSON** are believed to be located at, or in close proximity to, **SUBJECT PROPERTY**, as described in the following paragraphs.

5.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since August of 2021.  Prior to joining the ATF, I was employed by the Philadelphia Police Department ("PPD") for approximately nine (9) years in various capacities including but not limited to patrol, plainclothes, and investigatory assignments. My investigatory experience includes approximately four (4) years with Southwest Detective Division including (2) years with the Special Investigations Unit ("SIU") and a joint assignment to Philadelphia's Gun Violence Reduction Task Force ("GVTF").  As a Detective with the PPD, I was jointly assigned to the ATF's Crime Gun Enforcement Team ("CGET") in Philadelphia, Pennsylvania, as a Task Force Officer ("TFO").  During my career with PPD, I made or participated in numerous arrests and investigations stemming from violations of both the United States and Pennsylvania Crimes Code.

6.     I am currently assigned as a Special Agent to ATF Group III, Crime Gun Enforcement Team ("CGET"), Philadelphia, Pennsylvania, whose primary mission is to investigate those individuals and groups that are engaged in the commission of violent state and federal violations. During my law enforcement career, I have received extensive training regarding

violations of state and federal law, with an emphasis on firearms and narcotics violations.  I have successfully completed the Criminal Investigator Training Program ("CITP") as well as ATF Special Agent Basic Training ("SABT"). I have conducted investigations of violent crime as well as violations of state and federal firearms and narcotics laws. These investigations have resulted in the seizure of firearms and various controlled substances.  I have conducted numerous interviews with individuals charged with firearms violations.  I have also conducted investigations involving cellular device information, including the use of historical "cell-site" location information.  Through my experience, I know that individuals involved in criminal activity, specifically the illicit purchase of firearms, often use their cell phones before, during, and after the commission of crimes.  I am familiar with federal search warrants and seizing evidence in accordance with the probable cause set forth in the affidavits. I have authored and executed federal search warrants in the past.

7.     The facts in this affidavit come from my personal observations, my training, experience, and that of other investigators, my review of documents, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter, or all of the facts developed over the course of this investigation.

8.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance); 21 U.S.C. § 843(b) (using a communication facility to cause or facilitate the commission or narcotics trafficking offenses); and 21 U.S.C. § 856 (maintaining drug-involved premises) have been committed, are being committed, and will be committed by **JOSE**

**GUZMAN** and others.  There is also probable cause to search the places described in Attachments A-1, -2, and -3, for the items further described in Attachments B-1, -2, and -3.

## JURISDICTION

9.      This Court has jurisdiction to issue the requested warrant because, the Court is "a district court of the United States . . . that has jurisdiction over the offenses being investigated." 18 U.S.C. § 2711(3)(A)(i).

## STATUTORY AUTHORITY

10.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance); 21 U.S.C. § 843(b) (using a communication facility to cause or facilitate the commission or narcotics trafficking offenses); and 21 U.S.C. § 856 (maintaining drug-involved premises) have been committed, are being committed, and will be committed by **JOSE GUZMAN** and others.  There is also probable cause to search the places described in Attachments A-1, -2, and -3, for the items further described in Attachments B-1, -2, and -3.

## PROBABLE CAUSE

11.      In September of 2023, CI #31976[1] informed investigators that they had been inside of an unspecified residence accessible through the west side of the 3000 block of N. Leithgow Street, Philadelphia, Pennsylvania, that prepared bulk crack cocaine.  CI#31976 stated he/she

---

[1] CI #31976 is a cooperating defendant that has previously provided ATF investigators with accurate, actionable intelligence of firearm and narcotics trafficking activities in Philadelphia, Pennsylvania.  CI #31976 has participated in the controlled purchase(s) of bulk narcotics at the direction of ATF investigators and has been paid subsistence while assisting investigators.

personally witnessed the resident of this property prepare crack from powder cocaine for a customer that is known to investigators but omitted from this report to protect the identity and safety of the CI. CI#31976 stated the male goes by "Tio" and described him as an older, Hispanic male.  CI #31976 identified the location by the white fence and provided a screenshot image of the residence.  CI #31976 further provided still images of crack-cocaine that had been prepared by "Tio" for the aforementioned customer.  Investigators determined the location to be 3046 N. Leithgow Street, Philadelphia, Pennsylvania, which is a vacant lot owned by the Secretary of Housing and Urban Development.  According to publicly available Philadelphia Property Records, this lot is immediately adjacent to the rear of 3047 N. Lawrence Street or the **SUBJECT PROPERTY**.  CI #31976 later identified a single image of Jose GUZMAN (DOB: 10/12/1974, FBI:156970KC4) as "Tio" or the **SUBJECT PERSON**.

12.     Beginning in April 2024, officers from the Philadelphia Police Department Narcotics Field Unit (NFU) were contacted by members of the Chester County Detectives – Drug Strike Force/HIDTA Unit, in reference to an ongoing drug trafficking investigation involving a male living in the city and county of Philadelphia named David ARROYO. David ARROYO was identified as having a date of birth of 3/19/97, PID# 1130820, with a previous address of 3019 Lawrence Street, Philadelphia, Pennsylvania. This investigation stemmed from multiple drug overdoses and overdose deaths occurring in Chester County Pennsylvania where BAD BUNNY stamped HEROIN/FENTANYL was involved. This investigation led to the knowledge of narcotics being in the area of 3000 N. Lawrence Street in Philadelphia.

13.     As the investigation entered June 2024, NFU investigators observed numerous transactions to lead them to believe that BAD BUNNY stamped narcotics were being sold on the 3000 block of N. Lawrence Street.

14.     On June 21st, 2024, members of NFU, established fixed, roving, and electronic surveillance in the area of 3000 N Lawrence Street. A man identified as Miguel JORGE was already on location at 3000 N Lawrence Street. JORGE was seen entering a black Toyota Highlander PA tag MGN-6951, in the rear passenger's seat. JORGE removed a red Wawa bag and walked inside of **SUBJECT PROPERTY**, where he remained for approximately ten minutes. JORGE then exited **SUBJECT PROPERTY**, with the red Wawa bag noticeably lighter.  JORGE, stayed on location at 3000 N Lawrence Street, for a brief period of time then left the area in the black Toyota Highlander. Surveillance was terminated a short time later. Investigators believe, based on physical and electronic surveillance of Jorge, that his activity documented on this day was Jorge bringing a quantity of heroin/fentanyl to **SUBJECT PROPERTY** to resupply street level dealers who operate on that block. 3047 N Lawrence Street is one of multiple houses on the 3000 block of N Lawrence Street that DTO members have been seen entering and exiting and is most likely a stash house and/or bag up location for the DTO.

15.     On July 5th, 2024, members of NFU, established fixed, roving, and electronic surveillance in the area of 3000 N Lawrence Street. Immediately on the west side of 3000 N Lawrence Street, a male named Joel PEREZ was observed making numerous hand-to-hand transactions (United States Currency for objects), reaching along the curb line, removing small items and handing them over to purchasers. JORGE was observed parking his black Toyota Highlander PA on 3000 N Lawrence Street, walking to the west side of the street and standing on location while PEREZ continued to make hand-to-hand transactions. JORGE then entered **SUBJECT PROPERTY**, where he remained for approximately ten minutes. JORGE then exited **SUBJECT PROPERTY**, walked over to PEREZ, and handed him a clear object in between cars on 3000 N Lawrence Street. PEREZ then continued to make hand-to-hand transactions.

Surveillance was terminated shortly after. These observations helped solidify that **SUBJECT PROPERTY** is one of multiple houses on the 3000 block of N Lawrence Street that is likely a stash house and/or bag up location for the DTO.

16.     On July 25, 2024, USPIS intercepted Priority Mail parcel 9505512872534205907166, addressed to, "Antonio Maysonet, 3052 N Leithgow Street Philadelphia, PA 19133". The parcel listed a return address of "Orellana Urb. Metropolis Carolina, PR 00987". The parcel was mailed on July 23, 2024, from Carolina, Puerto Rico, weighed approximately 4 pounds 8 ounces, and was paid for with cash. A search of CLEAR showed the name "Antonio Maysonet" does not associate to the delivery address. Based on his training and experience and knowledge of an ongoing investigation of various drug trafficking organizations operating in Philadelphia and being supplied by source(s) in Puerto Rico, USPIS Inspector Matthew Tier suspected the parcel contained illicit narcotics, specifically cocaine.

17.     On July 29, 2024, at approximately 10:39 a.m., agents met with Philadelphia Police Department ("PPD") Officer Hill #7012 outside of USPIS headquarters. Officer Hill is assigned to the PPD's K9 unit and is the handler of K9 Vance[2], a narcotics detection dog. Agents hid USPS parcel 9505512872534205907166, on the curtilage of the property and K9 Vance located and indicated to the presence of narcotics in the parcel. The parcel was subsequently returned to USPIS for delivery.

_____

[2] P/O Hill and K9 Vader are certified in narcotic detection in, but not limited to, buildings, vehicles, freight, open areas, luggage, and warehouses. P/O Hill and K9 Vader are proficient in the search for marijuana, heroin, cocaine, crack cocaine, methamphetamine, and MDMA. P/O Hill and K9 Vader have completed training for the 2024 calendar year. A full list of all the training for P/O Hill and K9 Vader will be provided in discovery.

18.     On the same date, investigators began physically and remotely surveilling the area of 3052 N. Leithgow Street in anticipation of the delivery of USPS parcel 9505512872534205907166.

19.     USPIS Inspector Bennett, dressed in a USPS uniform, attempted to contact the resident(s) of 3052 N. Leithgow Street by knocking on the front door to deliver the parcel.  There was no response, and the parcel was subsequently left on the front porch of 3052 N. Leithgow Street in the view of surveilling agents.

20.     Several minutes later, agents observed a heavyset, Hispanic female exit 3054 N. Leithgow Street and approach the parcel.  The female appeared to inspect the label of the parcel before returning inside of 3054 N. Leithgow Street.

21.     At approximately 11:51 a.m., agents observed the **SUBJECT PERSON** exit the vacant, gated lot of 3046 N. Leithgow and proceed northbound toward 3052 N. Leithgow Street. Agents observed the **SUBJECT PERSON** retrieve the parcel from the porch by reaching through the metal railing on the south side of the porch before returning to 3046 N. Leithgow Street which is immediately adjacent to rear of the **SUBJECT PROPERTY**.  Investigators noted that the 3046 N. Leithgow permits unencumbered access to the **SUBJECT PROPERTY** and appears to have been appropriated by the resident(s) of the **SUBJECT PROPERTY** as a gated, private parking lot.

22.     Minutes later, agents observed an unknown, bald, Hispanic male wearing tan pants, a white t-shirt, black wraparound sunglasses, and carrying a red Wawa bag approach and enter 3046 N. Leithgow Street on a bicycle.  Agents then observed the same male exit the property with a red Wawa bag and ride a bicycle eastbound across the vacant lot between 3000 N. Leithgow Street and 3000 N. 4th Street.  The male proceeded southbound on 3000 N. 4th Street.  Agents

were able to observe a USPS parcel in the red Wawa bag.  The male continued southbound onto the east side of 2900 N. 4th Street where he disappeared out of the view of surveillance in the area of 2957 N. 4th Street.  Investigators believe he entered one of four residences (2961, 2959, 2957 or 2953) or the vacant, gated lot at 2955 N. 4th Street.  Investigators continued to survey the area for the unknown Hispanic male for approximately 15 minutes before terminating surveillance. Agents later observed the same male return to 3046 N. Leithgow Street on a smaller bicycle at and reemerge with a white bag in hand approximately four (4) minutes later.

23.     On August 14, 2024, Comcast responded to a subpoena for subscriber records as they relate to the IP address 2601:47:4B01:FE50:45F3:77FD:A102:676B as it was assigned on July 26, 2024, at approximately 6:55:44 EST when that IP address was utilized to access the online USPS tracking tool to track USPS parcel 9505512872534205907166.  This was three days prior to its delivery at 3052 N. Leithgow Street.  Comcast records indicate the IP address was assigned to subscriber Jose GUZMAN at 3047 N. Lawrence Street, Philadelphia, Pennsylvania 19133 or **SUBJECT PERSON AND SUBJECT PROPERTY**, which is both the service and billing address.  Furthermore, the subscriber contact number is (215) 869-4652.  IP address logs indicate that GUZMAN tracked this package four (4) times. Using the internet services available on cellular phones, it is very likely that **SUBJECT PERSON** used a cellular phone to track the package.

24.     On July 26th, 2024, members of NFU established fixed, roving, and electronic surveillance in the area of 3000 N Lawrence Street. PEREZ was observed on the west side of 3000 N Lawrence Street. PEREZ then entered 3036 N Lawrence Street, exiting approximately 5 minutes later. PEREZ then began to make numerous hand-to-hand transactions to multiple males/females. JORGE was also observed on the highway of 3000 N Lawrence Street on the west side of the street. JORGE walked from the west side of the street directly into **SUBJECT PROPERTY**,

opening the door and walking in without hesitation. JORGE exited **SUBJECT PROPERTY** and immediately walked back over to the west side of 3000 N Lawrence Street, where PEREZ was still on location. An unknown black male arrived on scene and approached JORGE and PEREZ. That black male handed an unknown amount of U.S.C. to JORGE who then handed that U.S.C. over to PEREZ, who then handed small objects over to that unknown black male.

25.     On September 8th, 2024, NFU members established electronic surveillance in the area of 3000 N Lawrence Street. JORGE was observed arriving on 3000 N Lawrence Street in his black Toyota Highlander PA. JORGE then exited his vehicle and stood with **SUBJECT PERSON** and several other Hispanic males on the west side of 3000 N Lawrence Street. JOREGE and **SUBJECT PERSON**, as well as the other Hispanic males, then began to hand out 'samples[3] to drug users (customers), who frequent the 3000 block of N Lawrence Street. **SUBJECT PERSON** reentered **SUBJECT PROPERTY**, returning shortly after. Between 7:52 A.M. and 8:12 A.M., approximately 60 males and females received samples from JORGE and GUZMAN, as well as those other two or three Hispanic males.

26.     During August and September of 2024, investigators have observed the **SUBJECT PERSON** enter and exit the gated lot of 3046 N. Leithgow Street on multiple occasions. Most recently, on September 10, 2024, investigators observed the **SUBJECT PERSON** emerge from the gated lot of 3046 N. Leithgow Street and roll a green trashcan out to the street for collection.

---

[3] Samples are given out for multiple reasons. New additives in heroin/fentanyl or combinations of substances used to mix a batch of product will be passed out to users to rate the product to test the DTO's product.  Heroin trafficking DTOs will adjust their recipe to increase profitability, to secure customers who have developed a level of immunity to the current mixture, or to draw in new customers looking for a better high.  In addition, DTOs often introduce a new product on location, (for example a heroin/fentanyl area now selling cocaine), drawing customers away from other DTO's in the area. Sample can also be given out in appreciation to the customers who frequent the location daily and make the DTO financially stable.

27.     A query of PennDot records reveals the **SUBJECT PERSON** has as a class "C" driver's license issued on October 10, 2023, with the **SUBJECT PROPERTY** listed as his home address.   Furthermore, a query of publicly available property records reveals that **SUBJECT PERSON** purchased the **SUBJECT PROPERTY** on April 12, 2019.

28.     Investigators have determined **SUBJECT PERSON** has unfettered access to the **SUBJECT PROPERTY.** On multiple occasions over the past two months investigators have observed the **SUBJECT PERSON** use the main entryway door of the **SUBJECT PROPERTY** and the rear vacant lot of this same property. Investigators have also attributed the **SUBJECT PROPERTY** to the **SUBJECT PERSON** through a Comcast Cable bill and PennDot records. Investigators have also attributed the **SUBJECT PHONE** to the **SUBJECT PERSON** through USPS parcel tracking information.

29.     During the aforementioned surveillances, members of the DTO were consistently using their cellular devices, making and receiving phone calls before, during, and after narcotics transactions, making it exceedingly likely that **SUBJECT PERSON's** cellular devices contain evidence of narcotics trafficking, especially when considering that **SUBJECT PERSON** was tracking a package which most likely contained cocaine.

30.     The aforementioned synopsis is not intended to be a complete, chronological summation of all observations made by investigators or captured by video surveillance equipment. Remote surveillance video captured by ATF and PPD pole cameras was retained on a USB storage device and taken into ATF custody.

***<u>Probable Cause to Search the Cellular Phones and/or Electronic Devices for the Items and Information Described in Attachments B-1, -2, and -3</u>***

31.     I submit that if a cell phone, computer (including tablets), storage medium, or other electronic device is found in the **SUBJECT PROPERTY** or in the possession of the **SUBJECT PERSON**, there is probable cause to search and seize the devices for the items detailed in attachment B-2, in whatever form they are stored. As used herein, the term "electronic device" includes any electronic system or device capable of storing or processing data in digital form.  Furthermore, there is probable cause to believe that the items detailed in attachment B-2 will be stored on the device(s) for the following reasons:

    a.  Based on my knowledge, training, and experience, as well as information relayed to me by others involved in the forensic examination of electronic/digital devices, I know that data in digital form can be stored on a variety of digital devices.  I know that electronic devices, including cellular telephones used by narcotics traffickers and digital/computing devices, are likely to be repositories of evidence of crimes.  I know that an electronic device such as a cellular telephone or computer may contain data that is evidence of how the electronic device was used, data that was sent and received, and other records that may indicate the nature of the offense.

    b.  Based on my training and experience, and information from other law enforcement agents, I know that individuals engaged in drug trafficking crimes commonly use cellular telephones to help facilitate their schemes.  Cellular telephones will generally serve both as an instrumentality for committing the crime and as a storage medium for evidence of the crime.  From my training and experience, these devices frequently contain data that is evidence of how the device was used, data that was sent or received, notes as to how the criminal

conduct was achieved, records of Internet discussions about the crime, and other records that reflect the nature of the offenses.

c.  I also know through training and experience that individuals who commit drug trafficking crimes maintain the items and records described in Attachment B-1, -2, and -3 for long periods of time regardless of whether their perceived value to the offender has diminished.  This type of evidence is often generated, maintained, and then forgotten about.  Thus, electronic records and/or communications that one would think a prudent person would destroy because of their incriminatory nature are possessed long after they have come into the offender's possession.  Oftentimes, these individuals do not even realize the incriminatory nature of the records they keep.  I am aware of search warrants where incriminating documentary evidence dating back many months, and even years, has been located.

d.  I also know that with the advent of cloud storage systems such as iCloud, electronic files can be stored across multiple devices including cell phones and computers (including tablets).

32.     *Forensic evidence.*  As further described in Attachment B-1, -2, and -3, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PROPERTY** contained within the **SUBJECT PHONES**:

13

a.  Data on the storage medium, including cell phones, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Electronic file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer, a mobile device and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer, mobile device or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer, mobile device or storage media.  This "user attribution"

14

evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the device was remotely accessed, thus inculpating or exculpating the owner.  Further, device and storage media activity can indicate how and when the device or storage media was accessed or used.  For example, as described herein, devices typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer, mobile device or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the user.  Last, information stored within a device may provide relevant insight into the user's state of mind as it relates to the offense

under investigation.  For example, information within the device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer or mobile device works can, after examining this forensic evidence in its proper context, draw conclusions about how devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a device is evidence may depend on other information stored on the computer and the application of knowledge about how a device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer or mobile device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

33.  *Necessity of seizing or copying entire computers, cell phones or storage media.*
In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer or mobile device's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers and mobile devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast

array of computer and/or mobile device hardware and software available makes it

difficult to know before a search what tools or knowledge will be required to

analyze the system and its data on the Premises.  However, taking the storage

media off-site and reviewing it in a controlled environment will allow its

examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be

stored in a variety of storage media formats that may require off-site reviewing

with specialized forensic tools.

34.  *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the

warrant and would authorize a later review of the media or information consistent with the

warrant.  The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in

order to determine whether it is evidence described by the warrant.

35.  I believe that there is probable cause to conclude that the **SUBJECT PERSON**

resides at **SUBJECT PROPERTY** and that they utilize the **SUBJECT PHONES** in furtherance

of their illicit narcotics trafficking activities.

36.  Based on my training and experience, I know that individuals involved in narcotics

trafficking often maintain at least one cellular phone in order to conduct illicit narcotics trafficking

activities.  Based on my training and experience, I know that individuals involved in narcotics

trafficking also frequently switch telephone numbers and/or phones.  Despite the constant

switching of active telephone numbers, narcotics traffickers often keep old phones.

18

37.      Based on my training and experience, I know that narcotics traffickers commonly utilize their cellular telephones to communicate with co-conspirators to facilitate, plan, and execute their illicit narcotics transactions.  For example, I know that narcotics traffickers often store contacts lists, address books, calendars, photographs, videos, and audio files, text messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be used in furtherance of their narcotics trafficking activities. As outlined above, **SUBJECT PERSON** and others have communicated to one another via cellular phone(s) to negotiate and consummate the illicit trafficking of narcotics.

38.      More specifically, I know that those involved in narcotics trafficking communicate with associates or co-conspirators using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. I am aware that Apple-based and Android-based phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those involved in narcotics trafficking communicate with associates or co-conspirators using cellular telephones and tablets to send e-mails and text messages and communicate via social media networking sites including Instagram, as outlined above.  By analyzing call and text communications, I may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

39.      Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts.  I am aware that narcotics traffickers frequently list associates or co-conspirators in directories, often by nickname to avoid detection by others.  Such directories as the ones likely contained in the **SUBJECT**

**PHONES**, are one of the few ways to verify the numbers (i.e., telephones, pagers, etc.) being used by specific narcotics traffickers.

40.     In addition, I know that those involved with narcotics trafficking often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones.  This evidence would show associations between accomplices, i.e., photographs of accomplices and/or individuals common to co-conspirators.  I am also aware that narcotics traffickers often take photographs or make videos of illicit narcotics and their manufacture with their cellular telephones and tablets.  Based on my training and experience, those who commit these crimes often store these items on their phones in order to show to associates, and/or to upload to social media.

41.     Based on my training and experience and the training and experience of other agents, I know that narcotics traffickers often use a cellular phone's Internet browser for web browsing activity related to their trafficking activities.  Specifically, narcotics traffickers may use an Internet search engine to arrange, render payment for, or track parcel delivery services in furtherance of their narcotics trafficking activities.  Further, they may use the Internet to make reservations for narcotics trafficking-related travel.  In addition, I know that narcotics traffickers also use their cellular telephone's Internet browser to update their social networking sites in order to communicate with persons, including co-conspirators.  These communications can be stored locally on the mobile device in addition to being stored by the social media platform(s) they are accessing.

42.     In addition, narcotics traffickers sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in furtherance of their trafficking activities.  As this affidavit has shown above, these electronic devices may also contain GPS

navigation capabilities and related stored information that could identify where these devices were located.

43.     Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used.  In particular, I am aware that cellular telephones are all identifiable by unique numbers on each phone, including: serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN).  The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used by members of the conspiracy.  In addition, I am aware that by using forensic tools, information/data that users have deleted may still be able to be recovered from the device.

## CONCLUSION

44.     Based on the forgoing, I request that the Court issue the proposed search warrant to authorize the search of the residence located at 3047 N. LAWRENCE STREET, PHILADELPHIA, PENNSYLVANIA, 19133 **("SUBJECT PROPERTY "),** the person of JOSE GUZMAN (DOB: 10/12/1974), and his cellular phone(s) or electronic device(s) to include but not be limited to the device that functions with phone number (215) 869-4652 (**"SUBJECT PHONES"**).

45.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because

their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

/s/ Zachary Jordan

Zachary Jordan
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE.

/s/ Craig M. Straw 9-12-2024

The Honorable Craig M. Straw
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**PROPERTY TO BE SEARCHED**

A residence located at **3047 N. LAWRENCE STREET, PHILADELPHIA, PENNSYLVANIA, 19133. ("SUBJECT PROPERTY").** The said premises is described as a Two-story, gray with blue trim, row home with a black storm door.  The residence can also be accessed through a white gate at 3046 N. Leithgow Street which is a vacant lot utilized by and under the control and domain of GUZMAN and functions as a rear yard and driveway for 3047 N. Lawrence Stret.  Accordingly, this lot is also to be searched by law enforcement.




**ATTACHMENT A-2**
**PROPERTY TO BE SEARCHED**

The property to be the cellular phone or electronic device that functions with phone number **(215)-869-4652 AND ANY OTHER MOBILE DEVICE BELONGING TO JOSE GUZMAN** ("**SUBJECT PHONES**").

**ATTACHMENT A-3**
**PERSON TO BE SEARCHED**

The person to be searched is JOSE GUZMAN aka "Tio", having a date of birth of 10/12/1974 and a home address of 3047 N. LAWRENCE STREET, PHILADELPHIA, PENNSYLVANIA, 19133. ("SUBJECT PROPERTY"), further described as a Hispanic male with bald head, brown eyes, approximately 5'8" tall, and stocky build, as pictured below:



3

**ATTACHMENT B-1**
**Particular Things to be Seized**

From the **SUBJECT PROPERTY** specified in Attachment A-1, all records relating to violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance); 21 U.S.C. § 843(b) (using a communication facility to cause or facilitate the commission or narcotics trafficking offenses); and 21 U.S.C. § 856 (maintaining drug-involved premises) that have been committed, are being committed, and will be committed by JOSE GUZMAN (DOB: 10/12/1974) and others, including the following devices which may contain electronic records and materials:

a.  The **SUBJECT PHONES**, as specified in Attachment A-2;

b.  Computers (including desktop computers, laptop computers and tablets);

c.  Electronic storage devices and media (including external hard drives and USB drives); and telephone answering machines;

d.  Evidence of communication relating to narcotics, including communications between the **SUBJECT PERSON** and others as participants narcotics trafficking, records and information relating to narcotics trafficking to include USPS shipping labels, USPS receipts and USPS parcel boxes.

e.  Evidence of usage of mobile devices in connection with drug trafficking and who used the mobile devices, including: logs of numbers called, received and missed; contacts including telephone numbers, addresses, e-mail addresses and names; SMS and other text message content and sending details, including messages and sender/receiver details.

4

f.  Records which evidence operation or ownership or use of computer or electronic equipment or mobile devices, including when such devices were used, regardless of timeframe, but not limited to, correspondence, sales receipts, bills, financial records, tax records, personal photographs, telephone records, notebooks, diaries, reference materials, or other personal items, and registration information for any software on the computer or device.

g.  All of which constitute the fruits, evidence and/or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance); 21 U.S.C. § 843(b) (using a communication facility to cause or facilitate the commission or narcotics trafficking offenses); and 21 U.S.C. § 856 (maintaining drug-involved premises) by JOSE GUZMAN and others.

5

**ATTACHMENT B-2**
**Particular Things to be Seized**

From the **SUBJECT PHONES**, or any electronic device as specified in Attachment A-2, all records relating to violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance); 21 U.S.C. § 843(b) (using a communication facility to cause or facilitate the commission or narcotics trafficking offenses); and 21 U.S.C. § 856 (maintaining drug-involved premises) by JOSE GUZMAN and others, including:

a.   Electronic communications relating to the criminal activity;

b.   Telephone or address directory entries consisting of names, addresses, telephone numbers; logs of telephone numbers dialed, telephone numbers of incoming, outgoing or missed calls, text/picture messages, schedule entries, stored memoranda, videos, social networking sites and digital photographs;

c.   Lists of customers and related identifying information;

d.   Types, amounts, and prices of narcotics trafficked as well as dates, places, and amounts of specific transactions;

e.   Any information related to sources of narcotics, including names, addresses phone numbers, and any other identifying information;

f.   Any information related to the methods of trafficking in narcotics;

g.   Any information recording domestic and international schedule or travel related to the described criminal activity, including any information recording a nexus to airport facilities, airport security, or airlines;

6

h. All bank records, checks, credit cards, credit card bills, account information, and other financial records;

i. Any information related to package delivery services, including but not limited to United States Postal Service, Federal Express and UPS;

j. All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system;

k. Stored memoranda; stored text messages; stored electronic mail; stored photographs; stored audio; and stored video relating to illicit narcotics trafficking;

l. Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

m. Evidence of the attachment of other devices;

n. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

o. Evidence of the times the device was used;

p. Passwords, encryption keys, and other access devices that may be necessary to access any of the devices;

q. Records of or information about Internet Protocol addresses used by the device;

r. Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "Favorite" web pages, search terms that the user entered into any Internet search engine,

7

and records or user-typed web addresses, as well as evidence of the posting of videos, photos, or any material relevant to these crimes to any social networking site;

s.  Evidence of user attribution showing who used or owned the electronic devices at the time the things described above were created, edited, or deleted, such as logs phonebooks, saved usernames and passwords, documents, and browsing history.

t.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

u.  All of which constitute the fruits, evidence and/or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance); 21 U.S.C. § 843(b) (using a communication facility to cause or facilitate the commission or narcotics trafficking offenses); and 21 U.S.C. § 856 (maintaining drug-involved premises) by JOSE GUZMAN and others.

**ATTACHMENT B-3**
**Things to be Seized**

From the **PERSON OF JOSE GUZMAN (DOB: 10/12/1974)** specified in Attachment A-3, all records relating to violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance); 21 U.S.C. § 843(b) (using a communication facility to cause or facilitate the commission or narcotics trafficking offenses); and 21 U.S.C. § 856 (maintaining drug-involved premises) by JOSE GUZMAN and others, including:

a. The **SUBJECT PHONES**, as specified in Attachment A-2;

b. Computers (including desktop computers, laptop computers and tablets);

c. Electronic storage devices and media (including external hard drives and USB drives); and telephone answering machines;

d. Evidence of communication relating to narcotics, including communications between the **SUBJECT PERSON** and others as participants narcotics trafficking, records and information relating to narcotics trafficking to include USPS shipping labels, USPS receipts and USPS parcel boxes.

e. Evidence of usage of mobile devices in connection with drug trafficking and who used the mobile devices, including: logs of numbers called, received and missed; contacts including telephone numbers, addresses, e-mail addresses and names; SMS and other text message content and sending details, including messages and sender/receiver details.

f.  All of which constitute the fruits, evidence and/or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute a controlled substance); 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance); 21 U.S.C. § 843(b) (using a communication facility to cause or facilitate the commission or narcotics trafficking offenses); and 21 U.S.C. § 856 (maintaining drug-involved premises) by JOSE GUZMAN and others.